# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #018

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **1st day of May, 2026** are as follows:

**BY Hughes, J.:**

**2025-C-01197**  **THEOPHOLIA THOMAS  VS.  BNSF RAILWAY COMPANY (Parish of St. Mary)**

JUDGMENT AMENDED; AFFIRMED AS AMENDED. SEE OPINION.

Retired Judge Guy Holdridge appointed Justice ad hoc, sitting for Justice pro tempore Penzato, recused.

Weimer, C.J., concurs in part and dissents in part and assigns reasons.

McCallum, J., dissents and assigns reasons.

Guidry, J., concurs in the result.

Holdridge, A.H.J., concurs in the result and assigns reasons.

# SUPREME COURT OF LOUISIANA

## No. 2025-C-01197

## THEOPHOLIA THOMAS

### VERSUS

## BNSF RAILWAY COMPANY

**On Writ of Certiorari to the Court of Appeal, First Circuit,
Parish of St. Mary**

**HUGHES, J.***

The defendant railroad company contests rendition of judgment against it, imposing liability and awarding damages following a train – garbage truck collision, arising when a wheel of the garbage truck became entrapped in a hole immediately adjacent to the planking of the railroad crossing, and the driver was thereafter unable to safely clear the crossing before being struck by the train. The writ application of the defendant was granted solely to review the degree or percentage of fault assigned to the parties. For the reasons which follow, we modify the percentages of fault assigned to the parties and affirm as amended.

## FACTS AND PROCEDURAL HISTORY

The facts and procedural history of this case were detailed in **Thomas v. BNSF Railway Co.**, 23-1209, pp. 2-7 (La. App. 1 Cir. 8/6/24), 395 So.3d 907, 908-12 (footnotes omitted):

> On September 16, 2016, at approximately 11:35 a.m., Theopholia Thomas was driving a garbage truck on a collection route for Pelican Waste & Debris, L.L.C., in the Town of Baldwin. As Mr. Thomas drove in a southwesterly direction on Railroad Avenue, which

---

*Retired Judge Guy Holdridge appointed Justice ad hoc, sitting for Justice pro tempore Allison H. Penzato, recused.

runs parallel with multiple railroad tracks that are owned and maintained by different railroad companies, he stopped before turning off of Railroad Avenue onto Lockley Street. Each of the two employees working from the back of the garbage truck, known as "hoppers," jumped off of the truck to empty garbage cans located near the intersection. One of the hoppers walked across the railroad crossing to access the few houses located on the other side of the dead-end Lockley Street. The weather was rainy, but there were no visual obstructions blocking the view of oncoming trains in either direction along the railroad tracks.

Mr. Thomas did not see or hear any oncoming trains as he proceeded to turn right onto Lockley Street in order to access the Lockley Street crossing over the railroad tracks. It is undisputed that this particular railroad crossing was maintained by the BNSF Railway Company ("BNSF"). The wooden plank crossing was marked with a standard railroad cross-buck sign that warned of the railroad crossing, along with a stop sign mounted on the same pole. Mr. Thomas admitted that he did not stop at the stop sign after turning onto Lockley Street, because he had stopped prior to turning. He denied seeing or hearing any oncoming trains coming from the north side of the Lockley Street crossing. There was testimony about a blind spot due to the side mirrors on the garbage truck.

When Mr. Thomas entered the Lockley Street railroad crossing, his turn was too wide, which resulted in the left front tire of the garbage truck dropping off the wooden planks on the south side of the crossing. The tire was then stuck between the railroad tracks. Mr. Thomas immediately began a process of reversing and pulling forward to maneuver the garbage truck fully up onto the crossing. Once he was successful in backing out of the area where the garbage truck's tire was stuck, he realigned all four truck tires onto the crossing, and he began to pull forward to go across. It was at that point that Mr. Thomas saw the oncoming BNSF train, which was blaring its horn and bearing down on the Lockley Street crossing at approximately 36 miles per hour. Mr. Thomas made a quick decision to accelerate the garbage truck in an attempt to clear the train's path, but before Mr. Thomas had cleared the crossing, the BNSF train collided with the rear portion of the garbage truck. The truck was knocked onto its left side, spilling garbage everywhere. The garbage truck was pushed down the railroad tracks until the BNSF train came to a stop. Mr. Thomas survived the collision, but was injured.

As a result of the accident and injuries, Mr. Thomas filed suit against BNSF. Mr. Thomas alleged that the crossing was not properly maintained by BNSF. According to several witnesses and exhibits at trial, the crossing was narrower than the street and was, therefore, in violation of industry standards, as well as BNSF's internal standards, which required railroad crossings to be at least one foot wider than the traveled roadway. Following a six-day jury trial on the merits in May of 2022, the jury was given a special verdict form composed of seven interrogatories. The jury returned the verdict form with responses to the interrogatories as follows:

**(1) Was BNSF Railway Company negligent?**

**Yes __X__          No _____**

If the answer to question 1 is yes, proceed to question 2. If the answer to question 1 is no, sign at the end and return to the courtroom.

(2) **Was the negligence of BNSF Railway Company a proximate cause of the accident?**

Yes __X__          No _____
If the answer to question 2 is yes, proceed to question 3. If the answer to question 2 is no, sign at the end and return to the courtroom.

(3) **Was Theo Thomas negligent?**

Yes __X__          No _____
If the answer to question 3 is yes, proceed to question 4. If the answer to question 3 is no, proceed to question 5.

(4) **Was the negligence of Theo Thomas a proximate cause of the accident?**

Yes _____          No __X__
Proceed to question 5.

(5) **Please state the percentage of negligence, if any[,] attributable to the below parties.**

**(Note that the total of your percentage must be 100%)**

**BNSF Railway Company:**          __85__ %

**Theo Thomas:**                   __15__ %

(6) **Did Theo Thomas suffer any damage as a result of the accident on September 16, 2016?**

Yes __X__          No _____

If the answer to question 6 is yes, proceed to question 7. If the answer to question 6 is no, sign at the end and return to the courtroom.

(7) **Without deducting any sums for the percentage of negligence, if any, which you have assigned above to Theo Thomas, please state what sum of money, if any, would reasonable and fairly compensate Theo Thomas for the following:**

**Past Lost Wages:**               **$ 330,000.00**

**Future Lost Wages:**             **$ 491,000.00**

**Past Medical Expenses:**         **$ 112,000.00**

**Future Medical Expenses:**       **$ 840,000.00**

**Past and Future Pain and Suffering:**   **$5,000,000.00**

**Past, Present and Future Loss of Enjoyment of Life:**   **$3,000,000.00**

3

**Franklin, Louisiana, this 31st day of May, 2022**

*s/ Debra Goulas*
**Jury Foreperson**

BNSF immediately objected to the jury verdict, maintaining that the verdict should be set aside as inconsistent and a new trial ordered pursuant to La. Code Civ. P. art. 1813. BNSF pointed out that the jury's answers to questions 4 and 5 were inherently inconsistent in that the jury found Mr. Thomas to be negligent, yet the negligence was not a proximate cause of the accident, and then assigned Mr. Thomas 15% of the fault for the accident. The trial court noted "[i]t look[ed] like that to [the court,] too" and stated that "the inconsistency" could be handled in a post-trial motion.

After the trial, BNSF filed a formal written objection to the inconsistent jury verdict and entry of any judgment on that verdict. Mr. Thomas opposed. During the hearing that followed, Mr. Thomas's counsel indicated that Mr. Thomas was willing to accept the 15% allocation of fault to him and argued that the jury clearly found that BNSF was 85% at fault for the accident. The trial court subsequently denied BNSF's objection to the jury verdict. On August 30, 2022, the trial court signed a final judgment in accordance with the jury verdict in favor of Mr. Thomas in the amount of $8,307,050.00, that included the 15% fault allocated to Mr. Thomas. BNSF moved for a Judgment Notwithstanding the Verdict and, alternatively, moved for a new trial, which Mr. Thomas opposed. The trial court issued written reasons for judgment and denied BNSF's motions.

BNSF then filed this suspensive appeal, assigning error to the trial court's entry of a judgment when there was an inconsistency in the jury's findings. BNSF also assigns error to entry of a judgment against it in the absence of evidence of a breach of duty and in the absence of legal causation. Essentially, BNSF argues that Mr. Thomas was the sole party at fault for his failure to stop, look, and listen from a position where he had a clear view of the approaching train that had the right of way; he negligently made a wide turn that caused the garbage truck tire to become stuck; and then he panicked and attempted to beat the oncoming train instead of backing off of the crossing to allow the train to pass. Additionally, BNSF maintains that the general damage award is excessive and a clear abuse of discretion.

The court of appeal ruled that "[o]nce the jury found that Mr. Thomas's negligence was not a proximate cause of the accident in response to interrogatory number four, there could be no percentage of fault allocated to Mr. Thomas in response to interrogatory number five. … We find that the trial court's failure to follow Article 1813(E) [("When the [jury interrogatory] answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the court shall not direct the entry of judgment but may return the jury for further

4

consideration of its answers or may order a new trial.")] under these circumstances constitutes reversible error." **Thomas v. BNSF Railway Co.**, 23-1209 at p. 9, 395 So.3d at 913-14. Finding *de novo* review inappropriate, given that a preponderance of the evidence could not be determined "fairly from a cold record," the court of appeal vacated the judgment of the trial court and remanded for a new trial. **Id**., at 914-15. Assignments of error related to liability, causation, and an excessive quantum award for general damages were not addressed by the court of appeal.

On review by this court, we vacated the court of appeal judgment, and the matter was remanded to the appellate court, for the following reasons:

> The jury found plaintiff was negligent but his negligence was not a proximate cause of the accident; however, the jury thereafter assigned 15% negligence to him and 85% to defendant. These findings are inconsistent. See La. Code Civ. Pro. art. 1812C(1); **Ferrell v. Fireman's Fund Ins. Co.**, 94-1252 (La. 2/20/95), 650 So. 2d 742, 747. This inconsistency required the trial court to either return the jury for further consideration of its answers or order a new trial. See La. Code Civ. Pro. art. 1813(E); **Ferrell**, 650 So.2d at 747. The trial court's failure to do so is a legal error that interdicted the jury's fact-finding process relative to whether plaintiff's negligence was a legal cause of the accident. See **Ferrell**, 650 So. 2d at 747; **Gladney v. May**, 29,373 (La. App. 2 Cir. 5/7/97), 697 So.2d 1022, 1025, writ denied, 97-2417 (La. 1/9/98), 705 So.2d 1101.
>
> Such error generally prompts *de novo* appellate review of whether plaintiff's negligence was a legal cause of the accident. See **Ferrell**, 650 So. 2d at 747; **Gladney**, 697 So. 2d at 1025. Here, however, plaintiff consented to a judgment allocating 15% fault to him, effectively resolving the verdict's inconsistency by conceding his negligence was a legal cause of the accident. Under these circumstances, neither *de novo* review nor a new trial is necessary. The court of appeal thus erred in vacating the trial court's judgment on the jury's verdict and remanding for a new trial on these grounds.
>
> The court of appeal's judgment is vacated, and the case is remanded to the court of appeal for consideration of defendant's remaining assignments of error on appeal.

**Thomas v. BNSF Railway Co.**, 24-01252, pp. 1-2 (La. 1/28/25), 399 So.3d 404, 405 (per curiam).[1]

---

[1] A second writ application to this court, on the same appellate court decision, was denied by this court. **Thomas v. BNSF Railway Co.**, 24-01292 (La. 1/28/25), 399 So.3d 402 ("The pretermitted assignments of error will be reviewed by the court of appeal on remand….").

On remand, the court of appeal considered the defendant's remaining assignments of error, as to its claims that: there was an absence of evidence that it had breached any duty; there was an absence of evidence that it had legally caused the plaintiff's damages; and the general damage award was excessive and a clear abuse of discretion. **Thomas v. BNSF Railway Co.**, 23-1209 (La. App. 1 Cir. 8/21/25), 420 So.3d 732, 739. The court of appeal ruled that "given the conflicting evidence of record" the trial court jury was not clearly wrong in finding the defendant 85% at fault; "[t]o the contrary," the appellate court found "the jury's conclusion to be a reasonable one, and is amply supported by the record." **Thomas v. BNSF Railway Co.**, 420 So.3d at 743. Further, the appellate court found "no abuse of the jury's vast discretion in its assessment of general damages." **Id.**, at 748.

Thereafter, this court granted the defendant's writ application for the limited review of the percentages of fault assigned by the trial court. **Thomas v. BNSF Railway Co.**, 25-01197 (La. 12/9/25), 424 So.3d 615.

## DISCUSSION

Our review of this case reveals no manifest error in the jury decision finding both the plaintiff and the defendant at fault in contributing to the occurrence of this train – garbage truck collision. However, we conclude that there was error in the assignment of the percentages of fault of 85% to the railroad company and only 15% to the garbage truck driver.

Louisiana Revised Statute 45:323 requires railroads, whose tracks are laid on or across a public street of any municipality, to "keep in good condition and suitable for vehicular traffic that portion of the street lying between the rails of the tracks of such railroad and railways . . . and when the street is paved, whether before or after the tracks are laid, they shall pave, repave, repair, and keep in good condition and suitable for vehicular traffic that portion of the public street lying between the rails of the tracks used by such railroad or railways . . . with such character or kind of

6

paving, together with the necessary headers, as may, from time to time, be designated by the governing body of the municipality. . . ." See also La. R.S. 32:169(F) ("Nothing in this Section [(authorizing the placement of cross buck, stop, and other warning signs and/or traffic control devices)] shall relieve a railroad company of its responsibility to maintain safe crossings."). In addition, it was established that the width of the crossing planks was insufficient to meet BNSF internal standards or industry standards, calling for the edge of a crossing to be at least one foot wider than the edge of the adjacent roadway.

Significantly, the defendant railroad company in this case did not adequately maintain the wooden railroad crossing, serving as "that portion of the public street lying between the rails of the tracks used by such railroad," where the accident occurred, to the same width as the adjacent portions of the paved public street. This width deficit created a "hole" between the wooden railroad crossing and the rails, into which a wheel of the garbage truck fell, causing the plaintiff/garbage truck driver to become delayed in the railroad crossing while he maneuvered the garbage truck wheel back onto the wooden planks of the crossing. If there had been no such "hole" and, instead, the wooden railroad crossing extended out to the appropriate width, relative to the adjacent roadway, the garbage truck would not have become stuck in the crossing, and the plaintiff/garbage truck driver would have had sufficient time to traverse the crossing to the public street on the other side.

Nonetheless, the garbage truck driver was not free from fault, having violated several traffic laws immediately before the accident,[2] including La. R.S. 32:175,

---

[2] BNSF alleged, and evidence was introduced to suggest, that the plaintiff violated the following traffic control laws: La. R.S. 32:101(A) (requiring a driver of a vehicle intending to make a right turn at an intersection to make the right turn "as close as practicable to the right-hand curb or edge of the roadway"); La. R.S. 32:104(A) (stating that "[n]o person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required in R.S. 32:101, … or otherwise turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety"); La. R.S. 32:123(B) (requiring "every driver and operator of a vehicle approaching a stop intersection indicated by a stop sign shall stop before entering"); La. R.S. 32:171(A) (stating that "[w]henever any person driving a motor vehicle approaches a railroad grade crossing under any of the circumstances stated in this

which requires the driver of a vehicle approaching a railroad crossing, identified by the presence of a railroad cross buck sign, to "slow down to a speed reasonable for the existing conditions" or to "stop if necessary, before entering . . . the point nearest the intersecting rail of such railroad where the driver . . . has a clear view of any approaching train." Further, La. R.S. 32:175 requires such a driver to "listen and look in both directions along such track for any approaching train and for signals indicating the approach of a train," to "yield the right-of-way to any approaching train," and to "proceed only upon exercising due care and upon being sure that it is safe to proceed." See also **LeJeune v. Union Pacific Railroad**, 97-1843, p. 5 (La. 4/14/98), 712 So. 2d 491, 494 ("As a general rule, motorists approaching a railroad crossing must look and listen for possible oncoming trains before traversing the crossing."); **Young v. Louisiana Western R. Co**., 153 La. 129, 132-33, 95 So. 511, 512 (1923) ("The duty to stop, look, and listen must be performed at a time and place where stopping, looking and listening will be effective.").

In this case, video evidence from the train was presented, establishing that if the garbage truck (commercially-licensed "CDL") driver had stopped, looked, and listened before entering the crossing, the presence of the approaching train would have been apparent to him. The video shows the truck traveling parallel to the train tracks. The truck makes a right hand turn to cross the tracks, but the driver's side front tire goes into the "hole." The truck successfully backs out of the hole and

---

Section [(including when "[a] stop sign is erected at the approach to a railroad grade crossing")], the driver of such vehicle shall stop within fifty feet but not less than fifteen feet from the nearest rail of such railroad, and shall not proceed until he can do so safely"); La. R.S. 32:171(B) (mandating that "[n]o person shall stop a motor vehicle upon any railroad crossing"); La. R.S. 32:171(E) (stating that "[i]f a driver is involved in a collision at a railroad crossing … after driving past the railroad cross buck sign, the collision or interference is prima facie evidence of the driver's failure to yield the right of way"); La. R.S. 32:175(A) ("The driver or operator of a vehicle approaching a rail-highway grade crossing identified by the presence of a railroad cross buck sign shall slow down to a speed reasonable for the existing conditions, or shall stop if necessary…. The driver or operator shall listen and look in both directions along such track for any approaching train and for signals indicating the approach of a train. Having slowed or stopped in this manner, the driver or operator shall yield the right-of-way to any approaching train and then shall proceed only upon exercising due care and upon being sure that it is safe to proceed.").

stops. The truck goes forward, but stops again on the tracks. The truck goes forward again but too late to avoid the collision. We conclude that, if not for the plaintiff's own negligence, he would not have found himself in the path of the oncoming train.

In the instant case, had one or the other of the negligent actions of the plaintiff and the defendant not occurred, the accident would likely not have occurred. We conclude that the factual finding of the trial court - that the railroad was more at fault than the plaintiff - constituted a manifestly erroneous allocation of fault.

Only after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the allocation, and then only to the extent of lowering it or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. **Duncan v. Kansas City Southern Railway Co.**, 00-0066, p. 11 (La. 10/30/00), 773 So.2d 670, 680-81, abrogated on other grounds by **Pete v. Boland Marine & Manufacturing Co**., 23-00170 (La. 10/20/23), 379 So.3d 636.

Having found manifest error in the allocation of fault, we raise the percentage of fault allocated to the plaintiff by the trial court, from 15%, to the lowest point that can reasonably be attributed to the plaintiff's negligence in this case, 75%. Concomitantly, we reduce the defendant/railroad's fault from the 85% designated by the trial court to 25%, pursuant to the application of La. C.C. art. 2323(A).[3] As

---

[3] Paragraph (A) of Article 2323 states:

> A. (1) In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault attributable to all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.
> (2) If a person suffers injury, death, or loss partly as the result of his own negligence and partly as a result of the fault of another person or persons, then the following shall apply:
> (a) If the degree or percentage of negligence attributable to the person suffering injury, death, or loss is equal to or greater than fifty-one percent, then the person suffering injury, death, or loss shall not be entitled to recover damages.
> (b) If the degree or percentage of negligence attributable to the person suffering injury, death, or loss is less than fifty-one percent, then the amount of

amended, we affirm the trial court judgment.

## DECREE

As stated, we amend the trial court judgment and affirm as amended.

**JUDGMENT AMENDED; AFFIRMED AS AMENDED.**

---

damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

See also **Billeaudeau v. Opelousas General Hospital Authority**, 17-0895, p. 8 (La. App. 3 Cir. 4/18/18), 316 So.3d 1040, 1046, writ denied, 18-0819 (La. 10/15/18), 253 So.3d 1299 ("[T]he total of the percentages cannot exceed 100%....").

SUPREME COURT OF LOUISIANA

No. 2025-C-01197

THEOPHOLIA THOMAS

VS.

BNSF RAILWAY COMPANY

*On Writ of Certiorari to the Court of Appeal, First Circuit,
Parish of St. Mary*

**WEIMER, C.J.**, concurring in part and dissenting in part.

I agree with the conclusion reached in the majority opinion that the jury erred in assigning 85 percent fault to the defendant railroad. However, while I agree with the majority that such percentage is too high, I find the majority's reallocation of 25 percent fault is also too high. Based on the evidence in the record, I would find the railroad's fault should be lowered to 15 percent.

The majority concludes that the jury manifestly erred in allocating more fault to the defendant railroad than to the plaintiff. I agree. While a jury's findings based on determinations regarding the credibility of witnesses are typically entitled to great deference, where there is objective evidence from which fault can be determined, such evidence should be given more weight, allowing an appellate court to find manifest error even though a finding was based on a credibility determination. See **Rosell v. ESCO**, 549 So.2d 840, 844-45 (La. 1989) ("Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination."). In this case, the accident and the parties' actions leading up to the accident, were

captured on video. The video from the train is objective evidence that clearly depicts what occurred and leaves little question regarding fault. The video compels a finding that the plaintiff bears significantly greater fault for the accident.

Once a determination has been made that the jury's apportionment of fault was clearly wrong, this court can reallocate fault–but only to the extent of lowering it or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. **Tisdale v. Hedrick**, 22-01072, pp. 7-8 (La. 3/17/23), 359 So.3d 484, 490.[1] Determining percentages of fault requires consideration of the nature of each party's conduct and the extent of the causal relationship between that conduct and the damages claimed. **Latour v. Steamboats, LLC**, 23-00027, p. 16 (La. 10/20/23), 371 So.3d 1026, 1040. Consideration of several factors ("**Watson** factors") aids in the analysis of a proper degree of fault: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. **Tisdale**, 22-01072 at 8, 359 So.3d at 490 (referencing **Watson v. State Farm Fire & Cas. Ins. Co.**, 469 So.2d 967, 974 (La. 1985)). These same

---

[1] The issue regarding allocation of fault presents the following unique circumstances. As recognized in the majority opinion, the jury found plaintiff was negligent but that his negligence was not a proximate cause of the accident. However, the jury also assigned 15 percent fault to the plaintiff. This court previously found the jury's findings inconsistent, requiring the trial court to either return the jury for further consideration of its answers or order a new trial. **Thomas v. BNSF Railway Co.**, 24-1252, p. 1 (La. 1/28/25), 399 So.3d 404, 405. The trial court's failure to do so was deemed legal error, which would generally prompt *de novo* appellate review of whether plaintiff's negligence was a legal cause of the accident. *Id*. But because the plaintiff consented to the judgment allocating 15% fault to him, this court found he conceded his negligence was a legal cause of the accident, effectively resolving the jury verdict's inconsistency. *Id*. A potential issue is the degree of deference and standard of review that should be applied to such a verdict, and whether such a verdict is still deemed a jury verdict subject to manifest error review. Stated succinctly, does the stipulation/agreement to accept 15 percent fault impact the application of the manifest error rule? This issue was not raised in this case and remains academic.

factors guide an appellate court's determination as to the highest or lowest percentage of fault that could reasonably be assessed. **Tisdale**, 22-01072 at 8, 359 So.3d at 490.

Applying the **Watson** factors in this case leads to the conclusion that the plaintiff should have been allocated a significantly greater share of fault. The actions of Mr. Thomas, the driver of the dump truck, clearly constituted negligence in a situation where he was aware, or should have been aware, of the danger of an approaching train. Additionally, Thomas was a trained professional driver with a commercial driver's license, which requires additional knowledge and the passing of a skill test. As such, he is held to a higher standard of care than the general motoring public. See **Davis v. Witt**, 02-3102, pp. 13-14 (La. 7/2/03), 851 So.2d 1119, 1128-29. Thomas violated multiple safety regulations when he failed to stop and look for an oncoming train at the stop sign and cross buck sign before crossing the tracks.[2] Thomas sought to place all fault on the railroad based on the condition and width of the roadway, alleging that when he turned the truck to cross the track his tire became stuck in a hole that was adjacent to the wooden planks between the tracks. However, it must be noted that the hole was in the *opposing* lane of traffic and was only encountered because Thomas made a turn far too wide. Although the street was narrow, he crossed the center line and ran off the road into the hole on the opposite side of the road–the driver's side of the vehicle. Moreover, the driver's side front tire was not stuck in the hole the plaintiff complains of at the time of the accident. Thomas was able to extricate the truck tire from the hole, and had actually backed off of the tracks prior to the accident. Yet, despite remaining out of harms way, and having space to back up farther and completely remove the truck from the crossing prior to the accident, Thomas inexplicably attempted to re-cross the tracks, coming

---

[2] See La. R.S. 32:175(A).

3

to a complete stop on the tracks in the process, and yet again failing to yield for the passing train. There was no evidence that the railroad was actually aware of any danger or deficiency regarding the railroad crossing. The railroad did have a statutory duty to maintain a portion of the street at the crossing,[3] but there was no statutory duty to widen the street. Even accepting the jury's finding that the railroad was negligent or that the hole served no useful purpose and was essentially a potential trap for the unwary which caused the driver to panic, the objective evidence shows Thomas' conduct far exceeded any act of negligence by the railroad in causing the accident.

Likewise, Thomas' actions created a much more substantial risk than any action by the railroad. Crossing train tracks is considered a risky activity. If done without stopping, looking, listening, and yielding to an oncoming train, a serious risk of harm is created. By contrast, to the extent the crossing was too narrow, the railroad's failure to widen it did not create a higher risk of collision, and did not create the risk that a driver would fail to stop or look prior to crossing the tracks on two separate occasions.

The next **Watson** factor takes into account the significance of what was sought by the conduct. As both parties were engaged in activities that serve a public purpose (transportation and trash collection) at the time of the accident, this factor is neutral.

Thomas was in a superior position to avoid the accident. As noted above, Thomas was certified as a professional driver and should have known to use extra caution when crossing the railroad tracks. The video demonstrates the accident could have been easily avoided multiple times but for the poor decisions by Thomas immediately preceding the collision. Additionally, Thomas was familiar with the

---

[3] See La. R.S. 45:323.

4

crossing and used it regularly. Had he been concerned about the condition of the crossing, he could have chosen an alternative means to approach the tracks by staying in his lane of travel.

Finally, there were no extenuating circumstances that required Thomas to act in haste, without proper thought. Thomas was in the course of performing his duties as a trash collector. There is no evidence of any urgency related to that situation. Thomas had time to stop, look, and listen before crossing the tracks. Thomas could have waited for the train to pass, given that trains are incapable of making immediate stops. Furthermore, Thomas acknowledged that he failed to observe or hear the train even though the train continuously sounded a warning.

In sum, considering the parties' actions and their causal relationship to the accident, it is clear the railroad's fault is far outweighed by Thomas' acts of negligence. As detailed above, Thomas' negligent actions were directly related to the collision, while any negligence on the part of the railroad can only be considered to have had an indirect causative impact on the accident. See **Watson**, 469 So.2d at 974. After analyzing the facts and evidence using the **Watson** factors, I find 15 percent was the highest percentage of fault within the jury's discretion that could have been assigned to the defendant railroad. Thus, I must respectfully dissent from that part of the majority opinion allocating 25 percent fault to the railroad.

# SUPREME COURT OF LOUISIANA

## No. 2025-C-01197

## THEOPHOLIA THOMAS

## VS.

## BNSF RAILWAY COMPANY

On Writ of Certiorari to the Court of Appeal, First Circuit, Parish of St. Mary

**McCALLUM, J., dissents and assigns reasons.**

There is no evidence that defendant BNSF Railway Company's ("BNSF") actions or inactions were a cause in fact of the accident.

As explained in *Cash v. Delhi Office Bldg., LLC*, 53,006, p. 6 (La. App. 2 Cir. 9/25/19), 280 So. 3d 1275, 1280, "[c]ausation is the first issue to be resolved" and:

> [t]o be actionable, the cause need not be the sole cause, but it must be a cause-in-fact, and to be a cause-in-fact in legal review it must have a proximate relation to the harm which occurs, and it must be substantial in character.

*Id.* (citing *Home Gas & Fuel Co. v. Mississippi Tank Co.*, 246 La. 625, 166 So. 2d 252 (1964). This principle is well-settled in our case law. *See Chanthasalo v. Deshotel*, 17-0521, p. 9 (La. App. 4 Cir. 12/27/17), 234 So. 3d 1103, 1109 (To be actionable, the cause "must be a cause in fact, and to be a cause in fact it must have a proximate relation to the harm which occurs and it must be substantial in nature"); *see also*, *Minvielle v. Lewis*, 610 So. 2d 942 (La. App. 1 Cir. 11/20/92); *Bodoin v. Daigle*, 452 So. 2d 828 (La. App. 3 Cir. 6/27/84).

The plaintiff did not prove that BNSF's alleged substandard conduct was a cause in fact of his injuries. The video evidence from the train unmistakably shows the plaintiff extricated the garbage truck he was driving from the hole, the alleged defect in the track, successfully reversed the vehicle out of harm's way, and stopped. Had he remained in that position, the accident would have been avoided altogether. However, when the train was mere seconds from reaching the intersection, the

1

plaintiff inexplicably proceeded back onto the railroad tracks and stopped directly in the path of the train. But-for the plaintiff's actions, the accident would not have occurred.

The trial court manifestly erred in its finding that BNSF's actions or inactions were a proximate cause of the accident.[1]

---

[1] Ordinarily, a discussion of the retrospective or prospective application of the recent legislative amendment to La. C.C. art. 2323, effective January 1, 2026, would be warranted in this case. However, an allocation of 100% of the fault to the plaintiff would result in his inability to recover under the current or previous version of the Article. *See Keith v. U.S. Fidelity & Guar. Co.*, 96-2075 (La. 5/9/97), 694 So. 2d 180.

# SUPREME COURT OF LOUISIANA

## No. 2025-C-01197

## THEOPHOLIA THOMAS

## VS.

## BNSF RAILWAY COMPANY

On Writ of Certiorari to the Court of Appeal, First Circuit, Parish of St. Mary

**HOLDRIDGE, J.**, ad hoc, concurring in the result.

I agree with the conclusion reached by the majority opinion that the jury erred in assigning eighty-five percent fault to the defendant railroad. I further agree with the majority's reallocation of twenty-five percent to the defendant.

I write further to find that the standard of review in this case should have been a *de novo* review by this court. It is well-settled in Louisiana law that a jury's findings of fact or factual determinations may not be reversed in the absence of manifest error or unless the jury is clearly wrong. See **Stobart v. State of Louisiana through Department of Transportation and Development**, 617 So.2d 880, 882 (La. 1993). In this case, however, the judgment is not derived from the findings of fact of the jury. Rather, it is a judgment rendered due to a stipulation of the plaintiff's attorney. In such a unique circumstance, no deference is owed by the appellate court, and a *de novo* review should be the standard of review that is applied.[1]

I further agree with Chief Justice Weimer's concurring in part and dissenting in part opinion that the percentages of fault should be analyzed using the factors of

---

[1] In this case, the jury verdict form should have included an instruction after question four "Was the negligence of Theo Thomas a proximate cause of the accident" that stated, "If your answer to question 4 is no, allocate no percentage of negligence to the plaintiff in response to question five." To find the plaintiff negligent, the defendant had to prove both cause-in-fact and legal cause. See **Rando v. Anco Insulations Inc. 08-1163 (La. 5/22/09), 16 So.3d 1065.** The use of the term "proximate cause" in question 4 is confusing and maybe legally incorrect. See **Vince v. Koontz, 16-521 (La. App. 5 Cir. 2/8/17), 213 So.3d 448.**

**Watson v. State Farm Fire & Casualty Ins., 469 So.2d 967, 974 (La. 1985).**

Applying these factors and giving no deference to the trial court judgment, I find

that the award of twenty-five percent fault to the defendant railroad by the majority

is reasonable and supported by the record.[2]

---

[2] This result would be different in the future due to the enactment of Louisiana Civil Code Article 2323(A)(2)(a) that precludes a plaintiff from any recovery if their percentage of negligence is greater than fifty-one percent.